THE PEOPLE OF THE STATE OF NEW YORK ex rel. CLARENCE JACKSON, Relator, against HERMAN J. RUTHAZER, as Warden of City Prison of the City of New York, Borough of Manhattan, Defendant.

Supreme Court, Special Term, New York County, June 20, 1949.

*Curtis F. McClane* for relator.

*Frank S. Hogan, District Attorney* (*Salvatore J. Camp* of counsel), for defendant.

*Paul Webb, Solicitor-General, Ogden Doremus, Assistant Solicitor-General* and *Eugene Cook, Attorney-General,* for the State of Georgia.

HAMMER, J. Relator has brought this proceeding by way of a writ of habeas corpus to test the validity of his detention

upon a rendition warrant issued by the Governor of this State upon requisition of the Governor of the State of Georgia. The function of a habeas corpus proceeding is to test the legality of an arrest, detention or imprisonment. The relator does not question the legality in form or substance of the warrant or the requisition and the related papers. Therein it is shown and **he admits,** that in September, 1944, he was convicted of burglary, by a court of competent jurisdiction in Fulton County, Georgia, was duly sentenced to a term of twenty years in the Fulton County Penitentiary, at Atlanta, Georgia, and on May 8, 1948, he escaped and came to New York where he remained until arrested as a fugitive from Georgia.

These being the facts, it appears the crime charged, and of which relator has been convicted, sentenced and imprisoned, is a felony under the laws of both the demanding and remanding States, that relator is a fugitive from justice and as such the individual named in the warrant and requisition. Under such circumstances the relator's writ should be dismissed and the relator remanded to custody for delivery to the agents of the remanding State. (*People ex rel. Hauptman* v. *Hanley,* 153 Misc. 61, affd. 242 App. Div. 257; *People ex rel. Higley* v. *Millspaw,* 281 N. Y. 441). The relator, however, relying on *Johnson* v. *Dye* (175 F. 2d 250 [C. C. A. 3d], argued March 18, 1948, reargued March 21, 1949, decided and opinion filed May 17, 1949) asserts he is entitled to have the writ sustained and himself discharged from custody. Particularly the grounds relied upon are that he has suffered from, was threatened with and if surrendered and returned to the demanding State he will again be subjected to cruel and unusual punishment and in all likelihood meet his death at the hands of the prison authorities and their subordinates in violation of the Eighth and Fourteenth Amendments of the United States Constitution. Such charge might seem fantastic and unworthy of credence as to conditions tolerated in any part of our highly civilized country were it not for, the findings and enumeration of facts in *Johnson* v. *Dye* (*supra*) giving a measure of judicial authentication to certain articles in the magazines " Life " of November 1, 1943, and " Time " of September 13, 1943, in respect of certain conditions in Georgia prison camps, and the reference in the decision to the Report of the President's Committee on Civil Rights, dated 1947. The " Life " and " Time " articles and the committee report are also in evidence here. In the committee report we find the following:

"There are other cases in the files of the Department of Justice of officers who seem to be ' trigger-happy ' where weak or poor persons are concerned. In a number of instances, Negroes have been shot, supposedly in self-defense, under circumstances indicating, at best, unsatisfactory police work in the handling of criminals, and, at worst, a callous willingness to kill.

"Toward the end of the work of this Committee a particularly shocking instance of this occurred. On July 11, 1947, eight Negro prisoners in the State highway prison camp in Glynn County, Georgia, were killed by their white guards as they allegedly attempted to escape. The Glynn County grand jury exonerated the warden of the camp and four guards of all charges. At later hearings on the highway prison camp system held by the State Board of Corrections, conflicting evidence was presented. But one witness testified that there was no evidence that the prisoners were trying to escape. In any case, he said it was not necessary to use guns on them in the circumstances. ' There was no justification for the killing. I saw the Negroes where they fell. Two were killed where they crawled under the bunkhouse and two others as they ran under their cells. The only thing they were trying to escape was death. Only one tried to get over the fence.' The warden and four guards were indicted by a federal grand jury on October 1, 1947.

"It is difficult to accept at face value police claims in cases of this type that action has been taken against prisoners in ' self defense ' or to ' prevent escape.' Even if these protestations are accepted, the incidence of shooting in the ordinary course of law enforcement in some sections of the country is a serious reflection on these police forces. Other officers in other places seem able to enforce the law and to guard prisoners without resort to violent means.

"The total picture — adding the connivance of some police officials in lynchings to their record of brutality against Negroes in other situations,— is, in the opinion of this Committee, a serious reflection on American justice. We know that Americans everywhere deplore this violence. We recognize further that there are many law enforcement officers in the South and the North who do not commit violent acts against Negroes or other friendless culprits. We are convinced, however, that the incidence of police brutality against Negroes is disturbingly high."

It is noted that in the *Johnson* case (*supra*, p. 253) the court stated that " Irrespective of whether or not articles in magazines

of national circulation are admissible as evidence, the contents of the articles referred to were employed by some of the witnesses as a basis of comparison for conditions in Georgia camps personally known to them. Because of this we may consider the contents of the articles as did the court below.'' Remedial legislation of the Georgia prison system seems to have been provided by the Georgia Act of 1943 Special Session. (Georgia Code Ann. tit. 77, § 358 *et seq.*) This was supplemented by Act No. 617 approved February 1, 1946, which created the State Board of Corrections, and abolished whipping and all forms of corporal punishment, and barred all shackles, manacles, picks, leg irons and chains. Under the authority given by the act the State Board of Corrections on June 17, 1946, adopted and approved rules and regulations governing the penal system.

Thus the prison system of Georgia seems to have been brought abreast of the most modern penological practices of the various prison systems of the United States, both State and National.

In this proceeding at the first hearing on May 23, 1949, upon the return of the writ, the only witness was relator. He testified to certain alleged happenings wherein he stated he was brutally mistreated, as a result of which he lost the sight of his left eye and also suffered a broken arm which was improperly set and is somewhat deformed. He also related these incidents: On one occasion, being a '' trusty '' he was called upon to accompany the guards in pursuit of an escaping prisoner, when the party came upon another guard with a smoking shotgun from which he ejected two shells, which relator later recovered, and after several hours elapsed relator was brought to the body of the dead escapee, upon which he saw evidence of shotgun wounds, and he was required to help take the body into a woods and bury it, and was thereupon threatened if he ever mentioned the occurrence, he also would be killed and given similar treatment. He also testified that later he was questioned about this happening by prison personnel and again threatened with death. Later still the camp clerk, who was armed with a gun, twice asked him to break open the lock and door of a tool house, and upon his refusal on the first occasion this clerk threatened to shoot him, and on the second occasion beat him with a large piece of wood. From these acts relator assumed this clerk was endeavoring to have him either attempt the commission of a crime or to run away so that the clerk could justify the use of the gun to kill the relator. The relator

also showed scars on both legs and testified they resulted from wounds caused by being shackled with leg irons or " picks ". No contradictory evidence was given, the District Attorney relying on the regularity of the executive warrants, the papers accompanying same, the presumptions arising, and the lack of probity of the uncorroborated testimony of an escaped convict. The relator placed reliance for corroboration on the articles in " Life " and " Time " and upon the Report of the President's Committee on Civil Rights. These were used as in the *Johnson* case, (*supra*), and as previously stated here as bases of comparison. They do not corroborate relator's statements as to what happened to him. They show what did happen to others at the camps or prisons other than that in which relator was confined. They do not even purport to show the present prison conditions or any since the enactment of the so-called Georgia Prison Reform Act. Relator claims he was cruelly treated between 1946 and 1948.

We feel constrained to repeat what was said in *People ex rel. Reid* v. *Warden of City Prison* (63 N. Y. S. 2d 620, 625–626) : " The uncorroborated testimony of an escaped convict serving sentence for armed robbery must be considered in the light of his record and the motivating incentive he has in relating the alleged instances prior to *and* at the time of the escape. * * * But it cannot be believed in the absence of clear proof, corroborated when resting upon the testimony of the felon involved that systematic brutality, threat and danger of death are tolerated by the prison officials of any state in the United States." (Italics supplied.) Here relator's criminal record shows the following:

```
"9-14-31 at Decatur, Ga.; Burglary.   3-5 yrs.
 8- 6-34 at Atlanta, Ga.; Burglary.   4-5 yrs.
 8- 7-34 at Atlanta, Ga.; Robbery.    Acquitted.
12-26-34 at Atlanta, Ga.; Burglary.   Dismissed.
 9- 4-35 at Atlanta, Ga.; Robbery.    4-5  yrs.  public  works
                  camp, at Monroe, Ga.  7-28-37 trans. to Ga. State
                  Prison,   Reidsville,  Ga.   1-6-40   Discharged.
                  (Good time allowance.)
 3- 5-40 at Atlanta, Ga.; Burglary.   1 to 2 yrs.
 4-10-42 at Atlanta, Ga.; Robbery.    Not guilty 7-31-44.
 5- 6-44 at Atlanta, Ga.; Robbery.    Not guilty  7-31-44.
 8-18-44 at Atlanta, Ga.; Burglary.   On 10-10-44, 2-20 yrs.
                  5-8-48 escaped.
 8-10-48 at Manhattan, Unlaw. Entry.
                  On 9-1-48, 1 yr. N. Y. Co. Penty, Spec. Sess. Ct."
```

The only witness, as pointed out above, testifying here and using the magazine articles as a basis of comparison of prison

conditions in Georgia was the relator. He testified he was required to wear leg spikes or " picks " fastened to the legs to hobble prisoners and prevent escape. The " Life " article states " the reform program outlaws picks ". Considering relator's testimony in the light of his police record running from 1931 to 1948, most of which is indicative of a propensity for burglary and robbery and noting at least one acquittal and one dismissal several months apart in 1934 and a " not guilty " disposition in 1944 and most of the remaining time spent in prison, it can hardly be said that there is any substantiation of the relator's testimony claiming cruel and inhuman treatment. He also testified that he was literate and had read the " Time " and " Life " articles which he said were indicative of present-day conditions. Lack of reliability is shown not only by previous police record, discrepancy in dates and self-interest, but also by the fact that although relator was in New York for a very short period after his escape from Georgia he was convicted here of unlawful entry and sentenced to the New York County Penitentiary on September 1, 1948. Lack of corroboration of relator's testimony of the continued existence of the conditions described in the " Life " article is contained in the " Life " article itself. The article states: " Under the new law the state highway work camps have been abolished and their prisoners transferred to the new state penitentiary in Tattnall County. The county camps must meet rigid state standards which are designed to end the long and black record of ignorant brutality. By next June [1944] even the traditional striped clothing will be gone."

At the conclusion of the first hearing on May 23, 1949, the proceeding was adjourned to June 16, 1949, at the request of both counsel for the submission of briefs by June 13, 1949. On the adjourned date the Hon. Paul Webb, Solicitor-General of the State of Georgia, and Ogden Doremus, Esq., Assistant Solicitor-General, and Hon. Eugene Cook, Attorney-General of the State of Georgia, appeared on behalf of the State of Georgia, and upon the motion of the District Attorney of New York County (by Salvatore J. Camp, Assistant District Attorney) they were given the courtesy of conducting the case upon the part of the State of Georgia. Upon motion also as representatives of the demanding State they were given the opportunity to present evidence in contradiction of the alleged incidents and brutalities testified to by the relator. Thereupon was offered testimony of the clerk charged with the attempted *provocateur* of an act by relator allegedly designed to provide justification of

the murder proposed by him of relator and the affidavits of the fellow convict who escaped with relator and of others contradictory of relator's testimony. Such testimony was in affidavit form and objected to by relator on the ground that the evidence was incompetent by reason of lack of opportunity to cross-examine. It was received subject to motion to strike out.

We rule that the affidavits in respondent's Exhibit 10, accepted, subject to motion to strike out which was considered made, are inadmissible, as proof of facts thereby sought to be proved. Affidavits presented to the executive and accompanying the Governor's warrant, and those used to support the return are undoubtedly prima facie proof of the facts stated therein and give rise to the presumption of the regularity which is attacked by the relator. These affidavits were not in that category but in fact were obtained later and were offered in reality as testimony in lieu of the presence of the persons making them as witnesses in court. The authorities relied upon by respondent and the State of Georgia on examination are found to support the above ruling. In *People ex rel. Trainor* v. *Baker* (89 N. Y. 460) the facts were shown by affidavit without objection and it was held that the court was therefore authorized to hold it sufficient and to act upon it. *People ex rel. Harris* v. *Warden of City Prison* (158 Misc. 945) held that the affidavit which was the basis of the Governor of the demanding State was admissible as evidence that relator was in the demanding State when the crime was committed.

On behalf of the State of Georgia the following witnesses appeared and testified: Leidy W. Sheehe, Secretary of the Grand Jury of Fulton County, Georgia, Jefferson B. Hatchett, Acting Director of State Board of Corrections, in charge of all penal institutions of Georgia, and Carl Mills, Superintendent of Ben Hill Prison, Georgia. The testimony of these witnesses, produced by the State of Georgia, and the records of the Georgia prison kept in its regular course of business of relator as a prisoner disprove the relator's testimony of the alleged incidents related by him. These witnesses were subjected to rigorous and thorough cross-examination by relator's attorney. Upon close scrutiny their testimony must be accepted as true. Contrary to relator's testimony that he lost the sight of his eye through brutality in 1948, the prison record shows the eye was accidentally injured by a stone at a quarry in 1942 and the impairment of sight was not due to the accident but to an organic ailment. The prison records also contain a complete history of periodic physical

examination which are disproof of the claim of the brutally broken and badly set arm. They show that relator despite his record was a trusty and a camp cook, which gave him certain desirable privileges. The records and testimony also show no death of a prisoner either from natural or other causes in denial of relator's claim of the killing and burial of an escaping convict.

Cruel or unusual punishment of any person or the deprivation of the right of safety and security of the person or of their legal rights and privileges from the free or even from the imprisoned is shameful and intolerable. The impairment of the civil rights of any of our citizens or other residents among us should have the consideration of all. There is no greater duty or responsibility resting upon officials generally, and the courts and judges in particular, than that of maintaining the protective principles of our Constitution and laws. They are intended for the equal security of all regardless of race, creed or color. They should be enforced both in letter and intent. Arbitrary action, unjust treatment and discrimination by the powerful to the lowly, or by the majority to a displeasing minority, or by a controlling class to a controlled class, constitute lawlessness and tyranny. They are contrary to our basic concepts of Americanism and democracy. Deploring and condemning all such discrimination and impairment we are nevertheless led to the decision here that the evidence is insufficient to sustain the charges made by the relator. What was said in the *Hauptman* proceeding (153 Misc. 61, 68, *supra*) in respect of the construction of evidence in habeas corpus proceedings is appropriate and may be repeated here: " In considering evidence upon a habeas corpus proceeding a rule has been laid down for the guidance of the court of first instance. It is: ' In construing the evidence we are not to be governed by technical rules as in the case of a trial for a crime, but to regard it liberally in favor of the demanding state.' (*Ellison* v. *Splain,* 49 App. D. C. 99, 100; 261 Fed. 247, 248.) " Against the relator's unsupported testimony the presumption of regularity and of fair conduct in the demanding State and the evidence of seeming fair treatment in various imprisonments over the period from 1931 to 1948 require that conclusion.

We are mindful of the decision of the United States Supreme Court in *Commonwealth of Kentucky* v. *Dennison* (24 How. [U. S.] 66) in which Chief Justice Taney said (p. 107): " The words, ' it shall be the duty,' in ordinary legislation, imply the assertion of the power to command and to coerce

obedience. But looking to the subject-matter of this law, and the relations which the United States and the several States bear to each other, the court is of the opinion, the words ' it shall be the duty ' were not used as mandatory and compulsory, but as declaratory of the moral duty which this compact created, when Congress had provided the mode of carrying it into execution. The act does not provide any means to compel the execution of this duty, nor inflict any punishment for neglect or refusal on the part of the Executive of the State; nor is there any clause or provision in the Constitution which arms the Government of the United States with this power. * * * And we think it clear, that the Federal Government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it * * *."

For each State in every instance of a rendition proceeding, or for the judge holding same, to act as an arbitrary and capricious critic and censor of the administration of the criminal laws and penal institutions of every other State and to refuse rendition on the unsupported testimony of bad treatment and threatened harm of the escaped convict opposing return can find no support either in morals or in law. A refusal by an asylum State to surrender an escaped convict " in the absence of clearly established violation of constitutional right " would undoubtedly lead to reprisal. Many such refusals might result in the end of honor and comity between the States except under the compulsion of Federal authority. The honor of each State requires the utmost fair dealing and reciprocity between them. The honor of the demanding state should and must be looked to as security against any unlawful acts by its agents or prison personnel towards the prisoner returned upon executive requisition. The State of New York looks to and relies upon the State of Georgia to keep the fugitive from its justice here returned upon the demand of Georgia in reasonable security and safety during the continuance of his imprisonment. To do less might cast serious reflection upon the honor of both States.

Finally, in considering the United States Court of Appeals decision in *Johnson* v. *Dye* (175 F. 2d 250, *supra*) it must be borne in mind that this court, while controlled by the Constitution and applicable laws of the United States, is subject to the controlling decisions of the highest courts of the State of New York and the procedure and practice of New York. This was aptly pointed out by our Court of Appeals in *Matter of Morhous* v. *New York Supreme Court* (293 N. Y. 131, 139) in which the opinion was written by LEHMAN, Ch. J. There it was stated: " What we have

said is, of course, intended to apply only to the scope of the inquiry upon a writ of habeas corpus at common law, and under the practice in this State. Its scope in the courts of the United States has been extended by the Constitution and statutes as authoritatively construed by the Supreme Court of the United States. In those courts the common-law limitation does not apply that ' where a prisoner is held under a judgment of conviction passed by a court having jurisdiction * * * habeas corpus is not an available remedy, save for want of jurisdiction appearing upon the face of the record of the court wherein he was convicted.' ' The rule at the common law, and under the act of 31 Car. II c. 2 * * * seems to have been that a showing in the return to a writ of habeas corpus * * * based upon a judgment or decree of a court of competent jurisdiction, closed the inquiry. So it was held, under the judiciary act of 1789 (ch. 20, § 14, 1 Stat. 73, 81), in *Ex parte Watkins,* 3 Pet. 193, 202. * * * But when Congress in the act of February 5, 1867 (Ch. 28, 14 Stat. 385) extended the writ of habeas corpus to all cases of persons restrained of their liberty in violation of the Constitution or a law or treaty of the United States, procedural regulations were included, now found in Rev. Stat., §§ 754–761. * * * The effect is to substitute for the bare legal review that seems to have been the limit of judicial authority under the common-law practice, and under the act of 31 Car. II, c. 2, a more searching investigation, in which the applicant is put upon his oath to set forth the truth of the matter respecting the cause of his detention, and the court, upon determining the actual facts, is to '' dispose of the party as law and justice require.'' (*Frank* v. *Mangum,* 237 U. S. 309, 329–331.) No such extension has been made by Constitution, statute or judicial decision in this State.''

In the *Johnson* case (*supra*) it also appears that the relator had the support and corroboration of other witnesses and no evidence was offered in contradiction or refutation.

The conclusion is that relator has failed to prove the acts of brutality or of cruel or inhuman punishment claimed and that if returned he will be subjected to cruel and inhuman treatment, or be placed in grave danger of bodily injury or death. On the contrary, the evidence on behalf of the State of Georgia shows that the relator has been accorded due process of law and if returned will not be subjected to cruel and inhuman treatment or brutal and unusual punishment.

The writ is dismissed and the prisoner is remanded to custody for delivery to the duly authorized agent or agents designated to receive him in the warrant by the Governor of Georgia. On consent stay is granted to June 23, 1949.